**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| AARON SOLOMON | ) | |
| | ) | |
| Plaintiff, | ) | |
| V. | ) | DOCKET NO. _____ |
| | ) | |
| ANGELIA SOLOMON, | ) | |
| MELANIE HICKS, WYNN HICKS, | ) | JURY DEMANDED |
| ANNA SMITH, | ) | |
| KAMI ABBATE, and | ) | |
| JOHN DOES 1 THROUGH 25 | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT OF AARON SOLOMON

## INTRODUCTION

*"If you want truth to go round the world you must hire an express train to pull it; but if you want a lie to go round the world, it will fly; it is as light as a feather, and a breath will carry it. It is well said in the old Proverb, 'A lie will go round the world while truth is pulling its boots on.'"*

*Charles Haddon Spurgeon*

1. This matter is a perfect illustration of Mr. Spurgeon's lament and the "post-truth" society that social media has wrought. Defendants have managed to systematically and intentionally destroy Plaintiff with spurious and malicious falsehoods that have no basis in reality. They are not concerned with what is true and what is not. They are only concerned with destroying Plaintiff and generating outrage on social media in an effort to raise money and sell products. While they have tried to paint themselves as noble defenders of "free speech," in reality, this is a campaign of malicious bullying, cyber-stalking, generating clicks, and spreading lies. Plaintiff, as well as the unwitting consumers that Defendants are targeting, require immediate relief from this Honorable Court.

1

2.     This matter originally springs from years of litigation between Aaron and Angelia Solomon arising from their divorce proceedings and legal wrangling over child custody issues. After hearing the proof and listening to the witnesses in 2014, Judge Phillip Smith of the Davidson County Circuit Court awarded the parties a divorce and placed custody of the children 77% of the time with Mr. Solomon. Judge Smith's Order expressly stated that he made this determination due to his concerns with Ms. Solomon's mental health and untruthful testimony.

3.     In her limited time with her children, Ms. Solomon has spent the intervening seven years attempting to alienate her children from Mr. Solomon and, unfortunately, has been successful in doing so. Her own family has testified that this is the case. In addition to unrelentingly teaching her children to hate and fear Mr. Solomon, Ms. Solomon has repeatedly brought new actions and false claims of abuse against him in four different courts and has instigated at least seven separate child welfare investigations. All of these claims, without exception, have been found to be baseless and without merit.

4.     Ms. Solomon's conduct has been so egregious that the Honorable Judge Deanna Johnson of the Williamson County Circuit Court found that Ms. Solomon's last legal salvo qualified as an "abusive civil action" within the meaning of Tenn. Code Ann. § 29-41-106. As a result, Judge Johnson enjoined Ms. Solomon from bringing new claims against Mr. Solomon for a period of six years. Judge Johnson's final and unappealed Order is attached to this Complaint as **Exhibit A**.

5.     Having been foreclosed from bringing new claims against Mr. Solomon and/or having lost time and time again in multiple courts in front of multiple judges, Ms. Solomon and her friends have taken her case to social media, publically accusing him of egregious crimes such as sexual abuse of his daughter, and the attempted murder of Ms. Solomon, and they have even

stated that he murdered his beloved son, Grant, who died tragically in a car accident last year. Upon information and belief, Ms. Solomon has encouraged her daughter, a minor child, to make similar claims about Mr. Solomon. Ms. Solomon's own family believes she has systematically turned Gracie against her father and Ms. Solomon's parental alienation has caused Gracie to believe abuse occurred that did not actually occur.

6. Upon information and belief, Ms. Solomon and/or Ms. Hicks has publically shared highly confidential documents and testimony from juvenile court proceedings that contain sensitive information about the parties' children with the intent of having those confidential documents shared online.

7. These false and defamatory claims have been spread over social media by those in concert with her as well as well-meaning but duped online followers who have given these claims thousands of views and "shares." As of this writing, the Instagram account at issue in this case had over 4,000 followers.

8. Not only has Mr. Solomon lost his son to a tragic accident and his daughter to Ms. Solomon's campaign of parental alienation, but he is now forced to watch Ms. Solomon and the other Defendants systematically and maliciously destroy his reputation, his business, and his standing in the community.

9. Defendants' social media activity is not simply a vindictive exercise in spreading hatred about Mr. Solomon, it is part of a concerted commercial scheme to sell products and raise money for Angie Solomon by misleading consumers with false statements to generate sympathy. As will be shown below, Ms. Solomon has a long and sordid history of using false claims to raise money for herself and/or defrauding others. This false advertising and malicious campaign is

harmful to the community at large, not just Mr. Solomon, and is subject to redress by this Honorable Court.

10.     Moreover, the conduct by Defendants as described herein amounts to serious crimes under federal law, namely using computers in interstate commerce to extort, intimidate, and harass Mr. Solomon into giving up his valid custody rights. Moreover, Defendants have transmitted communications containing threats to injure his reputation and to falsely accuse him of a crime. Defendants' commission of these crimes has breached their duty of due care to Mr. Solomon and has caused and continues to cause him great harm.

## THE PARTIES

11.     Aaron Solomon ("Mr. Solomon") is a citizen and resident of Franklin, Tennessee.

12.     Upon information and belief, Angelia Solomon ("Ms. Solomon") is a citizen and resident of Franklin, Tennessee.

13.     Upon information and belief, Anna Smith ("Ms. Smith") is a citizen and resident of Franklin, Tennessee.

14.     Upon information and belief, Kami Abbate ("Ms. Abbate") is a citizen and resident of Franklin, Tennessee.

15.     Upon information and belief, Melanie Hicks ("Ms. Hicks") is a citizen and resident of Williamson County, Tennessee.

16.     Upon information and belief, Wynn Hicks ("Mr. Hicks") is a citizen and resident of Williamson County, Tennessee.

17.     The Solomons were formerly married and had two children, Grant Solomon and Gracie Solomon.

18.     Grant passed away last year in a tragic accident at the age of 18. Gracie Solomon is currently 14 years old and, upon information and belief, resides in Williamson County.

19.     John Does 1-25 are individuals that are presently unknown who, upon information and belief, have contributed to and assisted Ms. Solomon with the tortious and criminal activities described herein.

## VENUE AND JURISDICTION

20.     Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a).

21.     Venue is appropriate in this Court as the majority of the events giving rise to this Complaint occurred in this judicial district and concern a minor child who resides in this judicial district.

22.     Upon information and belief, all named Defendants reside in this judicial district.

23.     Upon information and belief, the John Doe Defendants also reside in this judicial district.

## FACTS

24.     Mr. Solomon filed for divorce from Ms. Solomon in Davidson County, Tennessee on or about May 13, 2013.

25.     Throughout the pendency of that action, Ms. Solomon made numerous allegations that Mr. Solomon was abusive physically, mentally, and sexually, to herself and to the parties' minor children.

26.     The allegations that Mr. Solomon had abused Ms. Solomon stemmed from her claims that he had tried to strangle her with the power cord of a blow dryer and hang her from a

shower head (the "Shower Incident"). In reality, Ms. Solomon staged the Shower Incident as a suicide attempt in order to gain attention and sympathy.

27.     While normally such claims might be dismissed as a "he said/she said" situation, in this case, Mr. Solomon was able to produce text messages from Ms. Solomon that definitively established that there was no attempted murder and instead that the Shower Incident was a staged suicide attempt. *See* **Exhibit B**, transcript of proceedings before the Honorable Phillip Smith, pp. 55-77. For example, Ms. Solomon sent text messages immediately after the Shower Incident as follows:

    a.  "But it's over for me now. You live with it."

    b.  "I'll always be watching over you."

    c.  "So this is my last writing on this earth."

    d.  "I guess I will prepare for what exists for the cowards on the other side."

    e.  "I staged [the Shower Incident] anyway, but who cares…  Unfortunately, I wouldn't kill myself, but you would memorialize my faking it to get attention and use it against me instead of love me."

    f.  "I am not suicidal. I made a bad choice for attention, but I accept responsibility for that choice and have learned why I did it and won't repeat it."

    g.  "I'm hysterical, and I'm ending it all."

    h.  "You are gone, and you took my babies again. I won't be alive through this day."

    i.  "I found one bullet in the chamber, and I left a note for the babies. I can't live this way."

    j.  "I called Mom, and I told her and Dad good bye. I never wanted to hurt myself, but I can't stand this pain, and you won't talk to me. You took my children. Again I hope one bullet does the trick because I sure don't know what I'm doing."

    k.  "I guess this is it for old Ang. I'm scared to do this, but I can't live [without you] and Gracie and Grant. Here goes."

28.     Despite being presented with these text messages while on the witness stand (all of which came from Ms. Solomon's phone number and some of which were still on her phone), and ***despite being under oath***, Ms. Solomon refused to recant her false allegations that Mr. Solomon had tried to kill her. Instead, she made excuses, claiming, for example, that she did not remember the texts, or that she was bluffing about killing herself simply to get Mr. Solomon back.  However, as the Court correctly stated at the time, Angie's testimony "doesn't add up and doesn't make sense."

29.     On July 13, 2013, after the hearing where the Court heard the witnesses and examined the evidence, Judge Smith of the Davidson County Circuit Court entered an order noting the times that it found that Ms. Solomon lacked credibility and/or lied directly to the Court:

> The Court finds that the most damaging testimony in this matter came from Ms. Solomon herself. The Court finds, simply stated, it does not believe Ms. Solomon's testimony. The Court, as a finding of fact, finds that it does believe that Ms. Solomon attempted to commit suicide, although she testifies that such may have been for the purpose of getting attention. The Court is very concerned about Ms. Solomon's behavior, her mental health and her most recent behavior. The Court, further makes the finding of fact that Ms. Solomon did text the parties' son as demonstrated by the exhibit of such that has been placed in the record. The Court makes a finding that it does not believe for one minute that Ms. Solomon did not send the text to the parties' son and Court was quite frank with Ms. Solomon. The Court makes a finding that it is quite concerned about the safety of the minor children, even in a supervised setting with the Mother.

Order (attached hereto as **Exhibit A**) p. 2.

30.     And again, as it ultimately stated in its November 27, 2013 order, the Court found that Ms. Solomon obviously staged this event:

> Further, the Court wants to determine if Ms. Solomon is continuing to accuse Mr. Solomon of attempting to kill her in light of the proof that the Court heard on the 21st of June, 2013, today's hearing, and the text messages that the Court has reviewed from both of those hearings.  The Court finds the real issue here is whether Ms. Solomon is dealing in reality at this point ***in light of the Court finding that it is crystal clear that Ms. Solomon staged this incident in May, 2013***.

Compl. **Exhibit. A**, at 4 (quoting the November 27, 2013 Order).

31.     Despite all the other lies she told in the divorce proceedings, Ms. Solomon did not testify that her children witnessed the Shower Incident and, instead, when attempting to get an Order of Protection (which she ultimately dismissed), definitely stated that they did *not* witness the incident.

32.     During the pendency of the parties' divorce, someone made a referral of child abuse regarding the parties' minor children. Mr. Solomon asserted that the referral was made by Ms. Solomon herself in an attempt to gain leverage during the divorce proceedings. Ms. Solomon denied being the party that made the referral. In answer to a direct question from Judge Smith as to whether she was the one that made the referral to the Department of Children's Services ("DCS"), Ms. Solomon answered: "No."

33.     Judge Smith ordered that the DCS case workers be brought before him to determine who made the referral and in order for him to evaluate the abuse allegations. After hearing the testimony from the DCS workers and viewing the paperwork, the Court concluded that Ms. Solomon did make the referrals, despite her sworn testimony to the contrary. Judge Smith's January 8, 2014, Order states as follows:

> The Court finds that Ms. Solomon was not honest with this Honorable Court as relates to the referrals to the Department of Children Services. She in fact made the reports herself. […] The Court finds that based upon the documentation from the Department of Children Services and the testimony of the custodian of records, that she in fact is the person who made both referrals. ***The Court also finds based upon the behavior of Ms. Solomon that the Court finds she has misrepresented very important facts to this Honorable Court.*** The Court finds it has no choice but to enjoin and restrain Ms. Solomon from making any further referrals to the Department of Children Services regarding the minor children, Grace and Grant Solomon, without first discussing such referral with her counsel.

*Id.* (emphasis added).

34.     In the January 8, 2014 Order, Judge Smith noted that he had had DCS workers appear before him to testify regarding the numerous abuse allegations made by Ms. Solomon and

that all four referrals had been found to be unfounded by DCS. Judge Smith went on to state in the

January 8, 2014 Order as follows:

> The Court finds that as relates to Ms. Solomon's request for parenting time, that it will not order parenting time by Mother *because of the court's great concern with the false statements made and Ms. Solomon's overall lack of honesty with this Honorable Court since these proceedings first began. Further, the Court is concerned with the allegations contained in the referrals she made to the Department of Human Services regarding sexual abuse and physical abuse to her and the children. Her allegations are without any basis.* Therefore, the Court will not award any parenting time at this point out of concern for the children, other than supervised visitation with a third-party supervisor, which shall be at Ms. Solomon's expense.

*Id.* at p. 5.

35.     Moreover, Ms. Solomon's allegations that Mr. Solomon was abusing the couple's

children were also found to be without merit after at least two hearings on the matter. After hearing

the witnesses and considering the evidence, the Court found that none of these allegations was

true, as did the Department of Children's Services in its multiple investigations.

36.     The Court went on to find that Ms. Solomon needed mental health treatment:

> The Court does find that Ms. Solomon needs mental health treatment. It is, ORDERED, ADJUDGED AND DECREED that Ms. Solomon is to report to Dr. Freeman for him to prepare an evaluation and report to ascertain the kind of help that would be most beneficial to Ms. Solomon. The Court admonishes Ms. Solomon that the Court Orders this evaluation for the sake of all parties involved. The Court is of the opinion that Mr. Solomon still loves Ms. Solomon and he really does not want this divorce, but he sees no other way. The Court admonished Ms. Solomon that it is really up to her at this point and time. The Court Orders that until it receives the evaluation back from Dr. Freeman it is not going to allow Ms. Solomon any parenting time. *The Court is emphasizing that its concerns at this time are that great.*

*Id.*, p. 2-3 (emphasis added).

37.     The Court went on to find that Ms. Solomon had "evidenced in the presence of this

Honorable Court a severe mental health disability." Specifically, the Court stated:

> The Court is quite concerned that Ms. Solomon continues to engage in the type of behavior that she engaged in prior to the divorce as relates to such unfounded

allegations of abuse. *The Court makes a finding of fact upon the Court's observation of Ms. Solomon as a witness in the past, that she has evidence in the presence of this Honorable Court a severe mental health disability. The Court finds that she continues to make baseless allegations of abuse against Mr. Solomon, sexually and otherwise.*

*Id.* at p. 6 (emphasis added).

38.     Judge Smith was also concerned about the fact that Ms. Solomon sought an Order of Protection against Mr. Solomon in May of 2013, in which she made serious allegations against him and her own parents:

> The Court finds that Ms. Solomon continues to be estranged from her parents and family. Further, the Court is mindful that Ms. Solomon has previously made allegations of sexual abuse against her own Father and Mother. The Court finds that her Father has previously testified in this Court. The Court found his testimony credible. The Court makes the finding of fact that the behavior she exhibited prior to the entry of the Final Decree continues and leaves this Honorable Court to make a finding that the Restraining Order must remain in place to protect the parties' minor children. *The Court finds that Ms. Solomon continues to pose a threat of substantial harm to the children by her behavior and her obvious mental health issues which have been apparent to this Court since prior to the entry of the final Decree of Divorce.*

*Id. (*emphasis added).

39.     Despite making these serious allegations, Ms. Solomon voluntarily dismissed her own Petition for an Order of Protection, a fact that the Court found further undermined her credibility and reliability.

40.     At the conclusion of the divorce, Mr. Solomon was granted custody of the children for 77% of the time and Ms. Solomon's visitation was supervised. After roughly five months of no contact in 2013 at Judge Smith's order, Ms. Solomon was allowed to have supervised contact with the children.

41.     Despite the limitations on Ms. Solomon's access to the children, Mr. Solomon hoped that she would get well and she could resume more regular contact with the children because he believed it was in the best interest of the children to have a relationship with their mother.

42.     Meanwhile, Ms. Solomon was constantly criticizing Mr. Solomon to the children, mischaracterizing his normal and completely reasonable parenting rules—such as an appropriate bedtime and limits on screen time—as "controlling and crazy." She made up new false accusations like Mr. Solomon "told the children she had died," that he failed to properly feed the children, and controlled the "times they could go to the bathroom." *See* Declaration of Ms. Solomon's Father, Dan Huffines, filed contemporaneously with this Complaint. She constantly hurled new accusations of abuse that allegedly occurred before the divorce but that she had never mentioned before. She complained to a close friend that Mr. Solomon had abused the children by "tak[ing] the children to swim in a motel pool" while visiting a relative. *See* Declaration of Lori Cameron, filed contemporaneously with this Complaint. In short, she relentlessly repeated her baseless accusations of child abuse to these impressionable children and anyone else that would listen.

43.     More than one member of Ms. Solomon's own family has testified that she is a compulsive liar. Her father has testified under oath in court and by sworn declaration that many of the things she says are untrue, that he believes Mr. Solomon is a good man who has not abused the children, and that Ms. Solomon has spent years trying to turn the children against him. Her father has testified that he believes she has systematically convinced the children of abuse that never happened and was completely fabricated. *See generally* Dan Huffines Declaration. Her sister testified in a sworn affidavit that Ms. Solomon has made "horrible" and "absolutely false" statements that her sister attributes to Ms. Solomon's mental illness. Aff. Of Julie Huffines at ¶¶ 5-8. One of her former best friends similarly testified by sworn declaration that Ms. Solomon is

not truthful, will use her children to get what she wants, and lives in a "chaotic fantasy world." *See* Cameron Declaration, at ¶ 33.

44.     Rather than improve her mental health in order to increase her access to the children and act in a manner that was in the children's best interest, Ms. Solomon resumed her campaign of attacking Mr. Solomon with false claims of abuse in the courts. Over the intervening seven years, Ms. Solomon brought additional litigation in Coffee County and Williamson County. She brought the action in the Juvenile Court for Coffee County (the "Coffee County Action") shortly after the divorce was granted. In the Coffee County Action, she made serious allegations of abuse and neglect, much like the ones she had made in the Davidson County divorce litigation.

45.     Despite the serious allegations in her sworn petition causing Mr. Solomon to spend time and money in refuting them, she voluntarily dismissed the Coffee County Action with prejudice upon Mr. Solomon's Motion at the close of her proof. During the Coffee County Action, she instigated yet another DCS investigation, which, like all the others, was returned "unfounded."

46.     In August of 2018, Ms. Solomon filed another action, this time in the Juvenile Court of Williamson County (the "Williamson County Juvenile Court Proceeding I"). In her Petition, Ms. Solomon alleged sexual abuse, mental abuse, physical abuse, verbal abuse, and unhealthy atmosphere and that Gracie is terrified of her father. The vast majority of the allegations made in the Williamson County Juvenile Court Proceeding were the same allegations she had made in the Davidson County Divorce Litigation (which were determined to be without merit after a hearing) and the Coffee County Action that she dismissed with prejudice after a hearing.

47.     After considering the proof and holding hearings, the Williamson County Juvenile Court entered an order on October 31, 2018 holding that Ms. Solomon failed to prove that either

Grant or Gracie Solomon was a neglected and dependent child under the law. The Court further held:

> The Court finds that the allegations of sexual abuse were not proven, and further, these are the same allegations of sexual abuse that have previously been before the courts in Davidson and Coffee county that were dismissed, and assessed or investigated by the Dept. of Children's services in Rutherford County.

*Id.* at p. 9.

48.     As a result, the Williamson County Juvenile Court dismissed Ms. Solomon's Petition and ordered that the children be returned to Mr. Solomon.

49.     However, Gracie's counselor recommended that Mr. Solomon not enforce parenting time immediately and instead allow Gracie to stay with Ms. Solomon while Mr. Solomon improved his relationship with Gracie through counseling. Mr. Solomon followed the counselor's recommendations.

50.     Ms. Solomon appealed the Williamson County Juvenile Court decision to the Williamson County Circuit Court on May 1, 2019 and a hearing was scheduled for August 21st and 22nd of 2019. On May 29, 2020, while represented by counsel, Ms. Solomon non-suited and dismissed her appeal without notifying her attorneys. Her attorneys subsequently moved to withdraw from representing her, stating as grounds, "Ms. Solomon is not cooperating with counsel, or communicating with counsel, and it is therefore unreasonably difficult to continue to represent Ms. Solomon."

51.     Despite having non-suited her appeal, Ms. Solomon changed her mind and asked the Williamson County Circuit Court to allow the appeal to proceed, which the Court did.

52.     On December 16, 2019, Mr. Solomon filed a motion with the Williamson County Circuit Court to have Ms. Solomon's appeal be declared an "abusive civil action" as defined in

Tenn. Code Ann. § 29-41-101 *et. seq.* because of her insistence on litigating the same disproven allegations time and time again.

53. After review of the motions, the entire case file, the arguments of counsel, the testimony of the parties and the children's guardian *ad litem,* the Williamson County Circuit Court granted Mr. Solomon's motion, found that the matter was an abusive civil action, and enjoined Ms. Solomon from suing him again for six years. *See* **Exhibit A**.

54. Tragically, on July 20, 2020, the Solomons' son, Grant, was killed in a single car accident. He was 18 years old. All parties were understandably devastated.

55. The accident occurred when Grant's truck apparently slipped out of gear and rolled backwards down a sloped parking lot and landed in a rocky ditch. Upon information and belief, Grant was either standing to the side of or behind the truck when it began to roll backwards. The accident occurred in broad daylight, during regular business hours, just feet away from an open and operational business, and in clear view of a busy road.

56. The Gallatin Police Department and District Attorney's Office performed two investigations of this accident and found no evidence whatsoever of any foul play. *See* Declaration of Ronald Blanton, filed contemporaneously with this Complaint. Ms. Solomon was informed of the investigations. *Id.*

57. Having been foreclosed from bringing any new litigation against Mr. Solomon by the Williamson Circuit Court's Order of February 19, 2020, and yet still wishing to interfere with Mr. Solomon's custodial rights, Ms. Solomon had her friend, Defendant Melanie Hicks, file a Dependent and Neglect Petition on behalf of Gracie on October 9, 2020 wherein she alleged that Mr. Solomon had abused and neglected Gracie (Williamson County Juvenile Action II). This action contained the same disproved allegations of child abuse that Ms. Solomon had made so

many times before. In fact, since Mr. Solomon had not been alone with Gracie for two years, this proceeding necessarily addressed allegations that had already been adjudicated in Williamson County Juvenile Action I because no new incidents could have possibly occurred.

58.     The trial on the Hicks Dependent and Neglect Petition (Williamson County Juvenile Action II) was held on March 30, April 12, and April 23, 2021. The Hicks Petition was found to be without merit and, in fact, the Court ruled that it was Ms. Solomon, not Mr. Solomon, that had neglected the parties' minor child.

59.     After Ms. Solomon and Ms. Hicks' final attempt to improperly use the courts against Mr. Solomon failed, Ms. Solomon promptly took her case to social media. While Defendants have couched their campaign as a noble exercise in free speech, this is not the case.

60.     Ms. Solomon and the other Defendants cannot plausibly hope to overturn years of final court decisions on which the time to appeal has long since passed. Instead, the purpose of her social media campaign is to extort Mr. Solomon into giving up his custody rights and to raise money for herself.

## CREATION OF THE ACCOUNTS AND THEIR FALSE STATEMENTS

61.     Upon information and belief, on or about May 12, 2021, Ms. Solomon created, or caused to be created, an Instagram account called FreedomForGracie  (the "Instagram Account"). The Instagram Account referenced two highly defamatory videos posted on Youtube.com, as discussed herein. Shortly thereafter, similar accounts sprang up on other social media platforms, like Twitter and Facebook (collectively all of the "Freedom for Gracie" social media accounts will be referred to as the "Accounts").[1]

---

[1] FreedomForGracie (@freedomforgracie), Instagram, https://www.instagram.com/freedomforgracie; FreedomForGracie (@FreedomGracie), Twitter, https://twitter.com/FreedomGracie; Freedom For Gracie, Facebook,  https://www.facebook.com/pages/category/Personal-Blog/Freedom-For-Gracie-

62.    The Accounts purport to be "backed by a community of concerned citizens including teachers, attorneys, medical professionals, counselors, and friends." Mr. Solomon asserts that John Does 1 through 25 are involved in the creation of the Accounts and their defamatory and false content as is set forth herein.

63.    The Accounts have regularly and consistently posted false and defamatory content in violation of the rights of Mr. Solomon and others. A representative sample (but by no means all) of the false statements spewed by the Accounts is as follows:

  a.    That Mr. Solomon tried to kill Angelia Solomon prior to the divorce or otherwise physically abused her;

  b.    That Mr. Solomon sexually abused Gracie Solomon;

  c.    That Mr. Solomon physically and/or emotionally abused Grant and Gracie Solomon;

  d.    That Mr. Solomon murdered Grant Solomon and used his "influence" to see that no investigation was done;

  e.    That Mr. Solomon bought grave sites for Angelia and Gracie without Angelia's knowledge as part of some "murder suicide plan";

  f.    That Mr. Solomon was banned from participating in activities sponsored by the Williamson County Sports and Recreation Department because he was abusive to his wife, children, and others;

  g.    That he stole money from Grace Christian Academy and GCA "covered it up"

  h.    That he has filed "multiple bankruptcies";

  i.    That he has "swindled" unknown and unnamed people;

  j.    That he was fired from Channel 4 because he had "inappropriate content on [his] computer and phone'"

  k.    That he was diagnosed as a narcissist, sociopath, and/or sex addict;

  l.    That he abused some unnamed ex-girlfriend; and

  m.    That he "drugged" certain unnamed women."

---

110679161194219/; Freedom For Gracie, YouTube,
https://www.youtube.com/channel/UCWt5DfWxGiZ4Fas8baIvZLg.

*See* Declaration of Aaron Solomon, filed contemporaneously with this Complaint.

64.     All of these allegations are false, malicious, and made for the purpose of recruiting others to spread her falsehoods, selling products, and/or raising money for Ms. Solomon. They are further intended to harass and demean Mr. Solomon and to extort his valid custody rights from him.

65.     This is not the first time Ms. Solomon has taken to social media to spread falsities in an effort to con others into giving her money. She did this during the parties' divorce as well. She had to be admonished by Judge Smith for publically claiming that Mr. Solomon had stolen her children in an effort to raise money for herself. When confronted by Judge Smith over this falsehood, Ms. Solomon quickly back-tracked and claimed that "someone" had gotten into her account and that she didn't mean to hurt herself, Aaron, or the children. Before she was ordered not to raise money by Judge Smith, Ms. Solomon raised at least $4,000 from well-meaning people who did not know the reality of the situation. **Exhibit B** at 78. 5-15.

66.     Similarly, in the intervening years between the Solomon divorce and the current scheme with the Accounts, upon information and belief, others have made credible accusations against Ms. Solomon of credit card fraud and theft and that Ms. Solomon has threatened to "ruin them" with attacks of false and defamatory statements if the individual did not bend to her demands. The creation of the Accounts at issue here are just the latest scheme in a long line of scams.

67.     After Grant Solomon's death, concerned individuals donated roughly $14,000 for Gracie's benefit. Ms. Solomon spent all of that money in a few months.

68.     This time, Ms. Solomon has managed to convince others of her false version of events and persuaded them to join in her campaign of raising money for herself by use of false and malicious lies about Mr. Solomon and others.

69.     It is clear that Ms. Solomon has supplied much of the content for the Accounts, despite her sworn testimony that she has not. The Accounts are posting information that they **only** could have received from Angie. For example, Post 44 of the Instagram account contains a video that Angie took on her phone in 2013 with a caption that contains information (albeit false) only Angie would know. Instagram Post 28 contains Angie Solomon's private medical records. The Accounts have posted Angie Solomon's text messages with Aaron Solomon or with the Sherriff of Williamson County. Assuming Mr. Solomon or the Sherriff did not leak these text messages, they could have only come from Angie Solomon.

70.     By way of another example, the false and defamatory allegation that Mr. Solomon drugged women indisputably came from Ms. Solomon with the admission that the statement was being made and widely published with "no proof:"



71.     By way of another example, the screen shot below further demonstrates that Angie Solomon's sworn testimony that she is not associated with the Accounts is false. When writing about things that allegedly happened to "Angie," she makes a mistake and refers to herself in the first person in the very next sentence:



72.     Likewise, upon information and belief, both Angie Solomon and Melanie Hicks leaked highly confidential information from the juvenile court proceedings to the Accounts, which then posted the information. *See* Compl. **Exhibit F** (filed under seal).  These posts included screenshots of confidential statements made by Gracie's guardian ad litem and multiple posts about Gracie being taken from Angie and put into foster care.

73.     Upon information and belief, Melanie Hicks is acting in concert with Ms. Solomon and the other Defendants and has provided false and defamatory information regarding Mr.

Solomon and caused it to be posted on the Accounts and/or has distributed false and defamatory information concerning Mr. Solomon to others, including members of the Huffine family.

74.     Upon information and belief, Defendant Anna Smith is acting in concert with Ms. Solomon and the other Defendants to provide false and defamatory content regarding Mr. Solomon and has distributed this false information to others.

75.     Upon information and belief, Wynn Hicks is acting in concert with Ms. Solomon and the other Defendants and has provided false and defamatory information regarding Mr. Solomon and has caused it to be posted on the Accounts.

76.     Upon information and belief, Kami Abbate is publically publishing false and defamatory information about Mr. Solomon, namely that he has perpetrated abuse on Gracie Solomon.

77.      The purpose of the Accounts is to defame Aaron Solomon with the discredited abuse allegations that Ms. Solomon has been making for years and to enflame the public into sending money to Ms. Solomon, as demonstrated below:



78.     The Accounts make numerous false and defamatory statements about Mr. Solomon. For example, the Instagram Account's first post, which has over 28,000 views, references a YouTube video[2] featuring Gracie Solomon reading a statement that begins, "My brother died protecting me from my father, Aaron Solomon. My father is a monster." She goes on to state, "My father raped me, hurt me, and I am not going to be a victim of this monster." She states, "He is a rapist, he is a molester, he is a liar, and he is a killer." The video continues for nearly 14 minutes in this vein. These statements are false and defamatory to the extreme. Numerous DCS investigations have looked into these same allegations of physical abuse and each time were returned as "unfounded." Four different courts in five litigations have considered these same types of allegations and have concluded that they are not credible. Ms. Solomon's own family does not believe her accusations because they believe her to be a compulsive liar and have witnessed her trying to turn the children against Mr. Solomon even before the parties' divorce. The authorities in Gallatin have mounted two separate investigations into Grant's accident and have concluded there is no probable cause to believe it was anything other than an accident.

79.     Mr. Solomon did not kill his beloved son. Grant died just after getting out of his truck as he was preparing to go into a baseball training session—not in "protecting [Gracie] from [her] father." Mr. Solomon had absolutely nothing to do with his son's tragic death. These allegations of sexual abuse and murder are false and defamatory and are the result of Ms. Solomon's years-long campaign of parental alienation.

80.     On May 14, 2021, Wynn Hicks posted on his personal Instagram account calling Mr. Solomon "abusive, evil, and absolutely disgusting." He stated that Mr. Solomon abused Ms. Solomon and threatened her every night. Mr. Hicks strongly implied that Mr. Solomon sexually

---

[2] Freedom For Gracie, *Gracie's Story – A CRY FOR HELP*, YouTube (May 12, 2021), https://www.youtube.com/watch?v=bpNRNuaFhAk&t=15s.

abused his daughter. The Instagram Account then reposted Mr. Hicks' statements. These allegations are false and defamatory and are the result of Ms. Solomon's years-long campaign of parental alienation of her two children.

81.    On May 12, 2021, a YouTube video was posted on the YouTube channel "Freedom for Gracie" during which Anna Smith stated that Mr. Solomon sexually and physically abused his ex-wife and children, implied that Grant was murdered in order to prevent his testifying in court, and asserted that the courts have failed to protect Grant and Gracie.[3] These allegations are false and defamatory and are the result of Ms. Solomon's years-long campaign of parental alienation of her two children. The video contained at least the following defamatory statements:

- "Grant went on to tell me that his father, Aaron Solomon had molested Gracie, his younger sister."
- "I asked Grant how long his father had been molesting Gracie and he explained that he remembered all the way back when she was a newborn."
- "He said he had watched Aaron try to kill his mother but was luckily unsuccessful."
- "Only a little bit later, Aaron took Grant and Gracie from their home and never took them back to see their mom."
- "Later Aaron had told both of his children that Angie was dead."
- "The Court system has once again failed and a child has once again been placed into the hands of an abuser."
- "Because of the Court's lack of concern and cowardly behavior, Gracie experienced her father inappropriately touching her on the North Carolina trip."
- "Still, the Judge failed to help the innocent children from a dangerous abuser."
- "Aaron is allowed at all events at GCA around hundreds of little kids for him to prey on."

82.    A screen shot of Ms. Smith's video is shown below:

---

[3] Freedom For Gracie, *wynn's testimony*, YouTube (May 12, 2021),
https://www.youtube.com/watch?v=0TmyVdC7_Q8.



83. Defendant Kami Abbate has likewise furthered these false allegations of abuse through numerous comments on the Instagram Account, including the following which implies that allowing Mr. Solomon to take Gracie off campus would be releasing Gracie to her "abuser":



84.     By way of another example, Ms. Abbate published the following comment which obviously refers to Mr. Solomon and falsely accuses him of abuse:



85.     A post on the Instagram Account made on May 17, 2021, states that "Grant and Gracie were terrified because . . . Grant witnessed Aaron attempting to murder his mother by

wrapping a dryer cord around her neck and trying to hang her from the shower head in the bathroom." This statement is false and defamatory. After a full hearing with live witnesses and consideration of the text messages between the parties, Judge Smith concluded that Ms. Solomon tried to commit suicide and that her claims that Mr. Solomon tried to murder her were not credible. Moreover, the proof showed that Ms. Solomon claimed at the time that the children were asleep and did not see her fabricated suicide attempt. *See* Cameron Declaration. The post appeared as follows:



86.     By way of another example, the Instagram Account posted the image below, implying that Mr. Solomon was buying grave plots because he planned to kill Ms. Solomon or Gracie and explicitly stating that the plots were purchased "without Angie knowing anything."



87.     Based on this false statement, commentators claimed—***and the Accounts agreed***—that Mr. Solomon is planning a "murder suicide[.]"



88.    Later, the Instagram Account ***edited the caption of this same post*** and adopted the narrative that Mr. Solomon was planning a "murder, murder, suicide" as their own—furthering this false allegation:

Aaron realized he wasn't going to be able to just step back into Gracie's life just because Grant was dead.

October 6,2020 Aaron Solomon went to Williamson Memorial and purchased the 3 grave plots next to Grant's without Angie knowing anything. One for Angie, one for Gracie, and one for himself. He went to the extent to have the names assigned to each plot. Why??? He and Angie had been divorced for years all the while he is slandering her to their community. And why in the world would a father think his daughter would need a grave plot at 13 years old? Wouldn't Gracie want to grow up, get married and have her own future and family and be buried next to her husband someday?

Fast forward to the day Angie went into the funeral home to get as many records as she could as she was gathering all paperwork stuff….

Angie gasped when she saw Aaron bought plots and had their names put on it. He never talked about it with Angie. He didn't do this to be kind. She could understand if he bought them for himself and shove that in her face to keep her from being buried next to her son. But, for Aaron to put her and Gracie's name on it sent chills up her spine.

Aaron has a motive with most everything he does. Angie and Gracie panicked. And their friends and their thought as was … 'murder, murder, suicide'

Maybe that's dramatic, but a life with Aaron is a life of fight and flight. Every fiber of their being believed he had something to do with Grant's death, they thought they were next.

89.     However, in reality, the day after Grant's death (on July 21, 2020), Mr. Solomon

***and*** Ms. Solomon, together with the funeral home director, picked out a burial plot for Grant. Mr.

and Ms. Solomon ***jointly*** decided and agreed on purchasing the three plots beside Grant's plot so

that the entire family would have the ability to be buried next to Grant should they choose to do

so. Ms. Solomon *insisted* that Mr. Solomon pay for these three additional plots. *See* Declaration of Pam Stephens, filed contemporaneously with this Complaint**.** There was nothing untoward or improper about the purchase of these plots other than a grieving father wanting his son to be buried near his family.

90.     The statements in this post are false and defamatory and are meant to whip up the Accounts' followers into a frenzy so that they will donate money and widely share her false statements. When confronted with sworn third party testimony that these allegations and other allegations were false, Defendants did not retract them or remove them from the Accounts.

91.     The Accounts have also claimed that Mr. Solomon wrote a fraudulent check to himself from the children's school, Grace Christian Academy ("GCA"), that Mr. Solomon defrauded multiple individuals, and that Mr. Solomon has filed for bankruptcy multiple times.  For example:

freedomforgracie  ⋮



1/2

♡ ○ ▽    • •    🔖

**155 likes**
freedomforgracie Post 39

Aaron has had multiple chapter 7 & 11 bankruptcy, this is
just one copy.

---

**155 likes**
freedomforgracie Post 39

Aaron has had multiple chapter 7 & 11 bankruptcy, this is
just one copy.

We know people go through financial hardships, but
those people don't become financial advisor to others.
And those people don't forge a check at their children's
school which is a felony.

Aaron works at Merril Lynch & you can read his bio (he's
public)
But we felt everyone should be aware to do your research
if you are trusting Aaron Solomon with your money.

This is public record.

But what's NOT public record is the many people Aaron
swindled for money in the area in which he lived. Those
stories have come to our attention.

Aaron did end up receiving a trust when his aunt died so
the swindling of money from others probably stopped
after he received a big trust.

Also note that when Angie & Aaron met, Angie was a
successful pharmacist, owned her own home and car.
The moment they married, everything went in his name
and as he slowly isolated her, and smeared her name to
others- he also slowly took everything away from her.

After getting fired from Channel 4 news (Angie knows
why but Channel 4 hasn't come forward yet to say why)
but Angie had to work two pharmacy jobs to keep up with
Aaron's spending because he wanted to keep up the
image.

Aaron was locally famous. This is interesting... When
Grant died, the one thing he cared about was "who

---



freedomforgracie  ⋯

freedomforgracie Post 20 Back in
2013 Aaron Solomon forged a check
to himself, using a staff person's name
for Grace Christian Academy. Simple
excuses were made, denial, and
confusion...and then of course it was
all swept under the rug. Who steals
from their kids school and has child
abuse reports against them yet has no
consequences and goes along like
nothing happened??? Aaron Solomon,
that's who. Yet the school does
nothing to hold him accountable for
his actions or protect the children and
he, to this day, is allowed on school
campus, announcer at baseball games,
and photographer for school events.
SICK!
#freedomforgracie
#justiceforgrant

♡ ○ ▽    🔖

**197 likes**
MAY 16

☺ Add a comment...    Post

92.     Again, all of these allegations are false.   First, Mr. Solomon has only filed bankruptcy once—a joint filing with Ms. Solomon more than ten years ago.  This fact is easily provable from a cursory review of bankruptcy court records. Second, Mr. Solomon has never "swindled" anyone, and there is no evidence that he has. Finally, Mr. Solomon never wrote a fraudulent check to himself from GCA.   The Headmaster of GCA has testified by sworn declaration that Mr. Solomon was "owed the money at issue and the check was properly issued to him.  Any statement, insinuation, or implication that Mr. Solomon stole or misappropriated money [from] GCA is false."  *See* Declaration of Robbie Mason filed contemporaneously with this Complaint

93.     The Accounts have repeatedly and falsely stated that Mr. Solomon was banned from the Williamson County Parks and Recreation Center due to abusive behavior towards children, his family, and staff.  For example:



94.     Again, these allegations are provably false.  Gary Hathcock, the Athletics Superintendent for the Williamson County Parks and Recreation Department, stated that they maintain records reflecting decisions to ban an individual from their facilities or leagues, and there is no record of any such action taken to exclude Mr. Solomon from any sports leagues, activities, or facilities. *See* Declaration of Gary Hathcock, filed contemporaneously with this Complaint.

95.     In fact, Mr. Hathcock confirmed that Mr. Solomon is *currently* participating in an adult softball league associated with the Department.  *Id.*, at ¶ 5.

96.     The Accounts have further stated that Mr. Solomon was mean and abusive to Grant and the children he coached in youth sports. This is also false. *See* Declaration of Scott Erby (filed contemporaneously with this Complaint) who has coached with Mr. Solomon and had a child on the same team as Grant for at least three years. Mr. Erby has testified that Mr. Solomon was supporting and encouraging of Grant, as well as all the children on the team. *Id.*, at ¶ 4. Mr. Erby also testified that he never saw Mr. Solomon become verbally abusive or aggressive with anyone. *Id.*, at ¶ 5. Based on his own personal observation over a lengthy period of time, he has always known Mr. Solomon to be a loving and supportive father who provided a loving and positive environment for his children. *Id*. at 9.

97.     There are numerous more provably false statements made by the Accounts that Mr. Solomon will not address here for the sake of brevity. Moreover, there are numerous false and defamatory statements that do not relate in any way whatsoever to the Accounts' supposed mission to address child abuse. For example, he Accounts have repeatedly stated false and defamatory reasons for Mr. Solomon's alleged termination from WSMV more than ten years ago, have mocked his financial circumstances, have mocked his clothing, have mocked his church attendance, and have even mocked his anatomy.

## DEFENDANTS' SCHEME TO RAISE MONEY

98.     Moreover, the Defendants, through the Accounts, are knowingly using Mr. Solomon's and Gracie's names, images, and likenesses in commercial advertising to sell products and solicit donations without Mr. Solomon's permission or consent.

99.     The Defendants are using Mr. Solomon's and Gracie's names, images, and likenesses (without Mr. Solomon's authorization) to solicit donations through the Venmo account identified above (@Brighter-Day-Friends07) and through a GoFundMe website[4] that can be and has been widely shared over social media:



---

[4] Freedom4Gracie, GoFundMe,
https://www.gofundme.com/f/freedom4gracie?utm_campaign=p_cp_display&utm_medium=copy_link&utm_source=customer (last visited May 20, 2021).



100.     Even the GoFundMe contains fraudulent information. On Twitter, the Accounts claim that Gracie is receiving free legal representation, although on GoFundMe, they claim to be raising money for Gracie's legal fees. For example, while arguing with an account they (incorrectly) believe is Mr. Solomon, the Accounts taunt that Gracie is receiving free representation from "the best lawyer in town":



101. Likewise, the GoFundMe lists donations that were not actually made. For example, the GoFundMe indicates that Steve Berger, the former head pastor of Grace Chapel, donated to this effort. In reality, in his sworn declaration filed contemporaneously with this Complaint, Pastor Berger has testified that he made no such donation and this information is false:



102.     Like the other falsehoods, this was done to generate outrage and clicks. For example, in the following screenshot, user "melissakirk5" illustrates exactly how Defendants' plan worked:



103.     The Accounts have also posted their intent to use Gracie's name, image, and/or likeness on a t-shirt that the Defendants will sell for a profit. The Accounts also use Mr. Solomon's name, image, and likeness to generate outrage and manipulate people into buying the t-shirts. A copy of the post promoting the t-shirt sales is below:



104.    Mr. Solomon has not given his consent for the use of his name, image, or likeness in this manner to solicit donations and sell goods.

105.    Mr. Solomon, as the custodial parent of minor Gracie, has not given his consent to use Gracie's name, image, or likeness in this manner to solicit donations and sell goods.

### DEFENDANTS' CONTINUED CAMPAIGN OF LIES

106.    On May 18, 2021, Mr. Solomon sent cease and desist letters to Anna Smith, Ms. Solomon, and Wynn Hicks, explaining that the allegations are false and demanding that the defamatory content be removed. Although they are of majority age, Mr. Solomon sent copies of these cease and desist letters to Anna Smith's and Wynn Hick's parents as well. Copies of these letters without their exhibits are attached **as Exhibits C, D, and E.**

107.     None of the defamatory content was removed and, in fact, additional defamatory content was added and followers were encouraged to spread the defamatory content even further:



108.     As the Accounts gained more followers, unknown individuals were sharing the false content and tagging local news media in an effort to further destroy Mr. Solomon's reputation with these defamatory falsehoods. The frantic slinging of false and defamatory information has continued unabated until the current day. In fact, just before this Complaint was filed, the Twitter Account was falsely claiming that it was in touch with Mr. Solomon's attorneys and implied (falsely) that it was in possession of facts indicating that Mr. Solomon's lawyers do not believe his claims and that they would abandon him. None of this is true:



109.    And, again, the Accounts are constantly tagging numerous press outlets in an effort to further and more widely distribute these falsehoods.

110.    Both Ms. Solomon and Ms. Hicks have denied having any involvement in the Accounts under oath. Upon information and belief, these denials were false. The Accounts are rife with information that only Ms. Solomon could provide, such as her own medical records and her own text messages. And, more recently, Ms. Solomon—posting under the guise of the "FreedomForGracie" Instagram Account—described something that happened to "Angie."

However, in the same post, she made the error of referring to herself as "I" instead of in the third person:



111.      There can be little doubt that Ms. Solomon has lied regarding her involvement with the Accounts and instead has been the source of much of the Accounts' false statements. However, upon information and belief, all Defendants, including the John Doe Defendants, also supplied and distributed false and defamatory information and acted with a common purpose—to destroy the character and reputation of Aaron Solomon in order to extort from him his valid custody rights, to harass and demean him, and to raise money for Angie Solomon. The Defendants each knew that the others intended to destroy Mr. Solomon's reputation and acted with a common plan to further that goal. Each of the Defendants made an overt act, including posting and sharing false information about Mr. Solomon, in furtherance of the common conspiracy among the Defendants, including the John Doe Defendants.

## THREATS OF HARM TO PLAINTIFF

112.    Mr. Solomon is being subjected to threats and public scorn as a result of the false

postings on the Accounts. For example, below is an example of a threatening direct message he

has received from a complete stranger:



An additional example is the following comment posted to the Instagram Account by user

"@bloodthirsty.butterfly":



**Comments**

freedomforgracie
@simplyoursocietyblog no sense

2h   Reply

aslowry1970 GraceChristian Academy
should be permanently shut down and
individuals prosecuted that broke the law
every time they did not report abuse to the
correct authorities. (The school account is
now blocking mentions on Insta btw. As
usual, criminals are cowards.)
@gcalionssports #RobbieMason
#steveberger #markbright

5h   6 likes   Reply

freedomforgracie @aslowry1970
damage control
On steroids

2h   Reply

bloodthirsty.butterfly Abusers and rapists
don't deserve to breathe air. This rotting
garbage heap needs to be locked in jail for
the rest of his life alone and hopefully die
of a painful heart attack to top it off. The
fact he wasn't locked away years ago and
even with all this evidence shown he still
hasn't been locked away really shows how
law enforcement is useless to the innocent
and is mostly just a violent force now. As a
survivor of rape i feel for this resilient
woman. What can we do to help?

7h   1 like   Reply

113.     Another poster bragged about how the falsehoods spread by the Accounts prompted

her to terminate her relationship with Merrill Lynch (Mr. Solomon's employer) and remove all of

her family's accounts:

43



114. And just in case friends and acquaintances of Mr. Solomon managed to miss this massive social media campaign, individuals associated with the Accounts have direct messaged friends and acquaintances of Mr. Solomon with these same false claims of abuse, for example:



115.     Moreover, the Accounts have worked in concert to stalk and harass Mr. Solomon by means of a computer. For example, the following Twitter posts are meant to threaten and alarm Mr. Solomon and imply that they are watching him at all times:



116.     There can be no serious dispute that the acts as described herein have caused severe mental anguish, emotional distress, and other serious harm to Mr. Solomon. Mr. Solomon has been extremely concerned about the nasty and aggressive tone of these false communications. Numerous individuals have spoken to Mr. Solomon expressing concern for his safety. Moreover, these acts are causing serious harm to unwitting consumers who are donating to Ms. Solomon's and the other Defendants' schemes because they have been misled and enflamed by the Accounts' false postings.

117.     Mr. Solomon filed an action in Williamson Circuit Court on or about May 21, 2021, seeking a temporary and preliminary injunction. The Court declined to grant the temporary

injunction, but granted Plaintiff's motion for expedited discovery, and set the preliminary injunction motion for a hearing on June 1, 2021. By agreement, the parties moved the hearing to June 22, 2021.

118.    On June 8, 2021, certain Defendants filed a motion to dismiss pursuant to Tennessee's Public Participation Act.

119.    Plaintiff responded to Defendants' motion to dismiss on June 17, 2021, demonstrating that the Act does not apply to this action because this is not a matter of public concern and because defamatory speech is not protected. Mr. Solomon also provided numerous third-party declarations establishing that many statements made by the Accounts are false and defamatory. In response, the Accounts have threatened these witnesses:



**FreedomForGracie**
@FreedomGracie

Replying to @TallisFinch

Anyone can sign a sworn statement. We live in a modern era of technology though. Those people are not going to be your friends for long. You have put their careers on the line.

11:54 AM · Jun 25, 2021 · Twitter for iPhone

120.    On June 21, 2021, the afternoon before the scheduled hearing, the Williamson County Circuit Court continued the hearing on Mr. Solomon's Motion for Injunctive Relief some five weeks or until July 28, 2021.

121.    Plaintiff took a non-suit in his case in Williamson Circuit Court on June 29, 2021, and filed the instant action immediately after.

**CLAIM ONE**
**DECLARATORY JUDGMENT AS TO ALL DEFENDANTS**

122.    All allegations above are incorporated by reference as if fully restated herein.

123.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Honorable Court that Defendants' conduct as described herein amounts to false advertising pursuant to the Lanham Act at 15 U.S.C. § 1125(a), and a deceptive trade practice under Tenn. Code Ann § 47-18-109.

124.    Plaintiff also seeks a declaratory judgement from this court that Defendants' conduct as described herein amounts to cyber harassment pursuant to 18. U.S.C. §§ 2261a, 875(d).

125.    The controversy between the parties is substantial, immediate, and real.

126.    The parties have adverse legal interests.

127.    Plaintiff has been damaged by the conduct described herein.

**CLAIM TWO**
**UNFAIR COMPETITION IN VIOLATION OF FEDERAL LAW**
**15 U.S.C. § 1125(a) AS TO ALL DEFENDANTS**

128.    Mr. Solomon repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

129.    The Defendants have made false or misleading statements of fact in commercial advertising and in their marketing efforts concerning their products, commercial activities, and requests for donations. They further made literally false and misleading statements about the services of Mr. Solomon These false statements constitute an overall fraudulent system for extracting sympathy and donations out of misled consumers.

130. The false statements and unfair competition as described herein actually or tend to deceive a substantial portion of the intended audience.

131. The false statement and unfair competition as described herein are material in that it will likely influence the deceived consumer's purchasing or donation decisions and or that consumer's decision to share or more widely disseminate the false statements of fact that Defendants are propounding in the marketplace.

132. The advertisements and commercial promotions have been introduced into interstate commerce.

133. There is a direct causal link between the false and defamatory statements as alleged herein and harm to Mr. Solomon.

134. Unless restrained and enjoined by this Court, both consumers and Mr. Solomon will continue to experience irreparable harm.

135. Mr. Solomon has no adequate remedy at law.

136. Mr. Solomon is entitled to compensatory damages, Defendants' profits, damages for corrective advertising, costs and attorney fees.

## CLAIM THREE
## DEFAMATION AS TO ALL DEFENDANTS

137. All allegations above are incorporated by reference as if fully restated herein.

138. As described herein, the Instagram Account and other subsequent "Freedom for Gracie" accounts on other social media platforms contain multiple false statements, including but not limited to, statements accusing Mr. Solomon of sexually abusing his daughter, physically abusing his ex-wife and children, and killing his own son.

139. These statements created and shared by Defendants have exposed Mr. Solomon to wrath, public hatred, contempt, ridicule and have deprived him of the benefits of public confidence or social interaction.

140. All Defendants, including the John Doe Defendants, have communicated a false statement or statements that refer to Mr. Solomon.

141. The statements were and are defamatory.

142. The statements were heard and read by persons other than Mr. Solomon, including members of the general public, who understood the statements' defamatory meaning and that they referred to Mr. Solomon.

143. Defendants broadcasted and continue to broadcast the false statements to individuals other than Mr. Solomon via social media.

144. All Defendants, including the John Doe Defendants, were negligent and/or acted recklessly in failing to determine if the statements were true before communicating them or, alternatively, the Defendants knew the statements were false before communicating them.

145. Mr. Solomon has been gravely injured and has suffered actual damages by the communication of the statements, and the statements alleging abuse, neglect, attempted murder, and murder are all false.

146. Mr. Solomon is entitled to compensatory damages for his economic losses, compensation for all injury to his reputation, and compensation for emotional distress caused by the defamation.

147. Because the Defendants are guilty of actual malice, wanton, reckless, and willful misconduct, Mr. Solomon is entitled to punitive damages.

148. Defendants do not enjoy any privilege that excuses or justifies the defamation.

## CLAIM FOUR
## INVASION OF PRIVACY AS AGAINST ALL DEFENDANTS

149.     All allegations above are incorporated by reference as if fully restated herein.

150.     The Defendants, including the John Doe Defendants, intentionally intruded upon Mr. Solomon's solitude or seclusion or his private affairs and concerns.

151.     This intrusion is highly offensive to a reasonable person.

152.     The intrusion has caused injury and loss to Mr. Solomon.

## CLAIM FIVE
## FALSE LIGHT AGAINST ALL DEFENDANTS

153.     All allegations above are incorporated by reference as if fully restated herein.

154.     All of the Defendants have publicized information that places Mr. Solomon in a false light.

155.     Defendants' publicity of this false information is highly offensive to a reasonable person.

156.     The Defendants knew or acted with reckless disregard to the falsity of the publicized matter and the false light in which Mr. Solomon would be placed.

157.     The statements made by Defendants implied a basis in defamatory facts.

158.     Defendants publicized these false statements with actual malice.

159.     Defendants' acts in publicizing this false information has caused extensive damage to Mr. Solomon.

## CLAIM SIX
## NEGLIGENCE PER SE AS AGAINST ALL DEFENDANTS AND ARISING FROM VIOLATIONS OF FEDERAL STATUTES TO PROTECT THE PUBLIC FROM CYBER HARASSMENT (18. U.S.C. §§ 2261A, 875(d))

160.     All allegations above are incorporated by reference as if fully restated herein.

161.    In spreading false and defamatory information about Mr. Solomon without a privilege to do so, Defendants have failed to use reasonable care in their dealings regarding Mr. Solomon.

162.    In addition, Defendants were negligent per se in that their acts violated 18 U.S.C. § 2261A because they involved using the interactive computer services, electronic communication services, and electronic communication system of interstate commerce with the intent to injure, harass, and intimidate Mr. Solomon by engaging in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to Mr. Solomon.

163.    Specifically, the Defendants used social media platforms, which are interactive, electronic communication services and systems of interstate commerce, with the intent of injuring, harassing, and intimidating Mr. Solomon by, among other things: ruining Mr. Solomon's reputation in his community and across the country, ruining his relationship with his daughter, denying him his custody rights to his daughter, and ruining his professional career. This caused and reasonably would be expected to cause substantial emotional distress to Mr. Solomon.

164.    Defendants were also negligent per se in that their acts violated 18 U.S.C. § 875(d) because they, with intent to extort from Mr. Solomon his custody rights, which is a thing of great value, transmitted a communication containing threats to injure the property and/or reputation of Mr. Solomon and threatened to accuse (and in fact did falsely accuse) Mr. Solomon of numerous crimes, including murder, theft, forgery, and/or assault and battery.

165.    Specifically, Defendants transmitted communications containing threats to ruin (and communications actually attempting to ruin) Mr. Solomon's reputation and threats to accuse (and actually accusing) Mr. Solomon of the crimes of murdering his son, attempting to murder his

wife, sexually abusing his daughter, physically abusing his family and others, and drugging women.

166.    18 U.S.C. §§ 2261A and 875(d) are federal penal statutes designed to protect the public and enable the courts to use the statutes to define a reasonably prudent person's standard of care because both statutes establish specific standards of conduct.

167.    Mr. Solomon belongs to the class of persons the statutes were designed to protect and Mr. Solomon's injuries are the type of injures the statutes were designed to prevent.

168.    Therefore, as Defendants have clearly violated both statutes, they have failed to meet the required standards of conduct and their behavior is negligent per se.

169.    Defendants' acts violating the statutes have caused and continue to cause Mr. Solomon extensive damages including, but not limited to, extreme emotional distress and injury to his reputation.

**CLAIM SEVEN**
**INTENTIONAL INFLICTION OF EMOTIONAL**
**DISTRESS AS AGAINST ALL DEFENDANTS**

170.    All allegations above are incorporated by reference as if fully restated herein.

171.    The Defendants' actions as described herein are extreme, outrageous, intentional and reckless.

172.    Defendants' conduct is so outrageous that it cannot be tolerated by polite society.

173.    The Defendants' conduct has resulted in serious mental injury to Mr. Solomon. Accusing Mr. Solomon of raping his own child and killing his deceased son is so outrageous that no reasonable person should be expected to endure it.

**CLAIM EIGHT**
**CIVIL CONSPIRACY AS AGAINST ALL DEFENDANTS**

174.    All allegations above are incorporated by reference as if fully restated herein.

175.    All Defendants have committed numerous predicate torts and crimes against Mr. Solomon, including at least the following: defamation, invasion of privacy, false light, negligence per se, fraud, and intentional infliction of emotional distress. Moreover, as set forth above, much of Defendants' behavior amounts to crimes under federal law, such as violations of 18 U.S.C. § 2261A and 18 U.S.C. § 875(d).

176.    There was a common design among the Defendants, including John Does 1-25, with each having the intent and knowledge of the other's intent, to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means. The unlawful purpose was to destroy Mr. Solomon's reputation and standing in the community and thereby collect donations and sell products to benefit Ms. Solomon.

177.    Each of these Defendants made an overt act in furtherance of the conspiracy.

178.    Each of these Defendants have caused extensive damage to Mr. Solomon, entitling him to compensatory and punitive damages.

### CLAIM NINE
### <u>INJUNCTIVE RELIEF AS AGAINST ALL DEFENDANTS</u>

179.    All allegations above are incorporated by reference as if fully restated herein.

180.    Mr. Solomon (as well as the community at large) has suffered and will continue to suffer immediate, irreparable injury if the Defendants are not enjoined from the further publication and distribution of the false and defamatory statements described herein.

### CLAIM TEN
### <u>VIOLATION OF THE TENNESSEE PERSONAL RIGHTS</u>
### <u>PROTECTION ACT AGAINST ALL DEFENDANTS</u>

181.    All allegations above are incorporated by reference as if fully restated herein.

182.    Defendants are, without Mr. Solomon's consent, using Mr. Solomon's name, image, and likeness on the Instagram Account and other social media accounts as an item for

commerce for the purposes of (i) advertising products and goods, (ii) fundraising, and (iii) soliciting donations and purchases of products.

183.     Defendants are, without custodial parent Mr. Solomon's consent, using minor Gracie Solomon's name, image, and likeness on the Instagram Account and other social media accounts as an item for commerce for the purposes of (i) advertising products and goods, (ii) fundraising, and (iii) soliciting donations and purchases of products.

184.     Therefore, Defendants have violated and continue to violate the Tennessee Personal Rights Protection Act (Tenn. Code Ann. § 47-25-1101 *et. seq.*) through Defendants' unauthorized uses of Mr. Solomon's and Gracie Solomon's name, image, and likeness.

185.     Mr. Solomon has been damaged by Defendants' actions and is entitled to all appropriate damages awardable under law.

**CLAIM ELEVEN**
**COMMON LAW PROCUREMENT OF BREACH OF CONTRACT AS TO ALL DEFENDANTS**

186.     Mr. Solomon repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

187.     Defendants, by their actions as described herein, have induced by misrepresentation the breach or refusal to perform lawful contracts with Mr. Solomon's employer in an effort to damage his relationship with his employer and have Mr. Solomon terminated or have his career and client relationships otherwise destroyed.

188.     Defendants, in full knowledge of Mr. Solomon's and his employer's contracts with third parties, purposefully procured the breach of said contracts by falsely representing to those third parties that Mr. Solomon's has filed numerous bankruptcy actions and committed certain abhorrent actions, which he did not commit. In particular, Defendants informed clients that

"everyone should be aware to do [their] own research if [they] are trusting Aaron Solomon with [their] money."

189.    Mr. Solomon has been injured by Defendants' actions and entitled to damages, injunctive relief, and an award of his reasonable attorney fees.

**CLAIM TWELVE**
**PROCUREMENT OF BREACH OF CONTRACT AS TO ALL DEFENDANTS IN VIOLATION OF TENN. CODE ANN. § 47-50-109**

190.    Mr. Solomon repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

191.    Defendants, by their actions as described herein, have induced by misrepresentation the breach or refusal to perform lawful contracts with Mr. Solomon's employer in an effort to damage his relationship with his employer and have Mr. Solomon terminated or have his career and client relationships otherwise destroyed.

192.    Defendants, in full knowledge of Mr. Solomon's and his employer's contracts with third parties, purposefully procured the breach of said contracts by falsely representing to those third parties that Mr. Solomon's has filed numerous bankruptcy actions and committed certain abhorrent actions, which he did not commit. In particular, Defendants informed clients that "everyone should be aware to do [their] own research if [they] are trusting Aaron Solomon with [their] money."

193.    Mr. Solomon has been injured by Defendants' actions and entitled to treble damages, injunctive relief, and an award of his reasonable attorney fees.

**CLAIM THIRTEEN**
**INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS**

194.    Mr. Solomon repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

195.     Defendants, by their actions as described herein, have intentionally and wrongfully interfered with Mr. Solomon's business relationships by falsely representing to both his and his employer's clients that Mr. Solomon has filed multiple bankruptcies and committed certain abhorrent actions, which he did not commit. In particular, Defendants informed clients that "everyone should be aware to do [their] own research if [they] are trusting Aaron Solomon with your money."

196.     Mr. Solomon has been injured by Defendants' actions and entitled to damages, injunctive relief, and an award of his reasonable attorney fees.

## CLAIM FOURTEEN
## <u>VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT AS TO ALL DEFENDANTS</u>

197.     Mr. Solomon repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

198.     Defendants, by their actions as described herein, have willfully engaged in deceptive acts that have disparaged the services and business of Mr. Solomon by false and misleading representations of fact.

199.     Mr. Solomon has been injured by Defendants' actions and is entitled to treble damages, injunctive relief, and an award of his reasonable attorney fees.

## CLAIM FIFTEEN
## <u>FRAUD AS TO ALL DEFENDANTS</u>

200.     Mr. Solomon repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint and incorporates such paragraphs herein by reference.

201.     As described herein, Defendants have made numerous false and misleading statements of fact and/or have concealed material facts for the purpose of misleading the

consumers they are targeting to raise money and sell products for Angie Solomon and Gracie Solomon.

202.    Upon information and belief, the Defendants have conspired together as described herein to mislead consumers with false and misleading statements of fact in order to increase the audience for their false and defamatory campaign against Mr. Solomon so as to generate false outrage, sell products, and increase donations.

203.    Consumers and others have relied upon Defendants' false statements to their detriment and have suffered damages and losses as a direct and proximate result. Moreover, consumers have relied on these false and misleading statements to act so as to damage Mr. Solomon and his employer.

204.    As a result of their egregious, willful, and malicious conduct, Defendants are liable to Mr. Solomon for punitive damages.

## PRAYER FOR RELIEF

Having fully pled, Mr. Solomon prays for the following relief:

1.  A declaratory judgment from this Court that Defendants' conduct as described herein amounts to violations of the Tennessee Consumer Protection Act as well as the Lanham Act's prohibition against false advertising.

2.  A temporary and permanent injunction against all Defendants, their agents, employees, attorneys, and all persons acting in concert with them from any further use, posting, publicizing, dissemination, or distribution of false and defamatory content concerning Mr. Solomon, his marriage, his divorce, his ex-wife, or his children.

3.  A temporary and permanent injunction against all Defendants, their agents, employees, attorneys, and all persons acting in concert with them requiring the removal of the Accounts

and all other "Freedom for Gracie" social media accounts that contain the defamatory content described herein, whether on Facebook, Twitter, and Youtube concerning Mr. Solomon.

4. A temporary and permanent injunction against all Defendants, their agents, employees, attorneys, and all persons acting in concert with them barring them from creating any other social media accounts publishing the defamatory content described herein.

5. A temporary and permanent injunction against all Defendants, their agents, employees, attorneys, and all persons acting in concert with them barring them from using Mr. Solomon's and Gracie Solomon's name, image, or likeness without Mr. Solomon's consent in violation of the Tennessee Protection of Personal Rights Act.

6. An order allowing the expedited discovery of the identities of all individuals with administrative rights to the Accounts at issue in this case as well as the IP address of any individuals with access to the Account(s) or that have used the Account(s) to post and/or spread defamatory material concerning Mr. Solomon.

7. An order prohibiting the Accounts from selling products or raising money using false or defamatory information concerning Mr. Solomon or any other falsity which incites consumers to donate money for Ms. Solomon or to buy products.

8. An order allowing the expedited discovery of the identities of any individuals posting or sharing false and defamatory statements regarding Mr. Solomon.

9. A judgment against each Defendant for all compensatory damages that Mr. Solomon has sustained in an amount to be determined at trial.

10. A judgement of treble damages for Defendants' violation of the Tennessee Consumer Protection Act and their procurement of breaches of contract with Plaintiff's employer so as to destroy his career;

11. A judgment for his reasonable attorney fees under the Tennessee Consumer Protection Act for Defendants' malicious and willful conduct;

12. A judgment against each Defendant for punitive damages in an amount to be determined at trial.

13. A judgements against all Defendants for any damages to which Mr. Solomon is entitled under the Lanham Act, including damages, punitive damages, funds for corrective advertising, and attorney fees and costs;

14. That Mr. Solomon be awarded any such further relief to which he might be entitled after a trial on the merits of these issues;

15. Mr. Solomon demands a jury to hear and try all issues properly submitted to the trier of fact.

Dated this 29th day of June, 2021.

Respectfully Submitted,

/s/ Paige Waldrop Mills
Paige W. Mills (BPR #016218)
Ashleigh D. Karnell (BPR #036074)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6200
Facsimile: (615) 742-6293
pmills@bassberry.com
akarnell@bassberry.com

*Attorneys for Plaintiff Aaron Solomon*

## VERIFICATION

I declare under penalty of perjury under the laws to the State of Tennessee that the facts stated in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

Aaron Solomon

Executed this 29st day of June 2021.

30881321.1

48